UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x Docket No.

SUSAN JONES,

FILED

JUN 2 2015

USDC WP SDNY

Plaintiff,

against

**15 CV 4241**

COMPLAINT

JURY TRIAL
DEMANDED

**JUDGE WOODS**

THE CITY OF NEW YORK, THE NEW YORK CITY
POLICE DEPARTMENT, FORMER NYPD POLICE
COMMISSIONER RAYMOND W. KELLY, NYPD
POLICE COMMISSIONER WILLIAM J. BRATTON, NYPD
POLICE OFFICER JOSEPH BONNER, NYPD POLICE
OFFICER MANUEL ALMANZAR, NYPD POLICE OFFICER
"JOHN" CHEN (Shield # 11880, first name being fictitious),
NYPD POLICE OFFICER "JOHN" CASACONE (Shield
# 12233, first name being fictitious), NYPD POLICE
OFFICERS "JOHN DOE # 1 through 5", THE NEW YORK
CITY DEPARTMENT OF CORRECTIONS, FORMER NYC
CORRECTIONS COMMISSIONER DORA B. SCHRIRO,
NYC CORRECTIONS COMMISSIONER JOSEPH PONTE,
NEW YORK CITY CORRECTIONS OFFICERS "JOHN
DOE # 6- 15", BELLEVUE HOSPITAL CENTER, NEW
YORK CITY HEALTH AND HOSPITALS CORPORATION,
THE STATE OF NEW YORK AND THE NEW YORK
STATE OFFICE OF COURT ADMINISTRATION, all named
Defendants being sued in their individual and official capacities,

Defendants.
--------------------------------------------------------------------------------x

Plaintiff, SUSAN JONES, by her attorney RALPH G. REISER, ESQ.,

complaining of the defendants allege upon information and belief as follows:

## PRELIMINARY STATEMENT

1. This is an action whereby plaintiff seeks relief for discriminatory conduct to

which she was subjected by the defendants on the basis of disability in violation of the

Americans with Disabilities Act, ("ADA"), 42 U.S.C. 12-101 et seq., Section 504 of the

Rehabilitation Act, 29 U.S.C. 794, the New York State Human Rights Law, (NYS Executive

Law-Article 15), and the New York City Human Rights Law, Administrative Code 8-102 et seq.

as well as for violation of plaintiff's Civil Rights secured by  42 U.S.C. 1983 and 1985, the U.S.

Constitution, the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, the

Federal Statutes hereinbefore mentioned and the laws of the State of New York.

2.  In addition, his is an action whereby plaintiff seeks relief for deprivation, under

color of statute, ordinance, rule, regulation, custom and/or usage, by the defendants of the rights

privileges, and immunities secured to plaintiff by the Fifth, Sixth, and Fourteenth Amendments

to the U. S. Constitution, the Federal Statutes hereinbefore mentioned, the State statutes

hereinbefore mentioned and by 42 U.S.C. 1983 and 1985.

3.  The claim arises from treatment to which plaintiff was subjected by the

defendants prior to, during, and subsequent to her arrest and pre-arraignment confinement on

June 2, 2012 as well as in connection with her hospital treatment at Bellevue Hospital during the

period of her confinement and in connection with her delayed arraignment in New York County

Criminal Court .

4.  Plaintiff seeks monetary damages (special, compensatory and punitive) against

the defendants, injunctive relief, as well as an award of costs, disbursements and attorneys fees,

together with such other and further relief as the Court deems just and proper.

## JURISDICTION

5.  Jurisdiction is specifically conferred on the United States District Court by 28

U.S.C. 1331, this being an action arising under the Constitution and Federal Law and the Fifth,

Sixth, and Fourteenth Amendments to the United States Constitution. The Federal Statutes under which the claims arise are the Americans with Disabilities Act, ("ADA"), 42 U.S.C. 12-101 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. 794, this being an action to recover for unlawful discriminatory practices on the basis of disability and handicap engaged in by the defendants in their treatment of plaintiffs as well as 42 U.S.C. 1343(a)(3), this being an action to redress the deprivation, under color of statute, ordinance, rule, regulation, custom and/or usage, of rights, privileges and immunities secured to plaintiff by the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution and by 42 U.S.C. 1983 and 1985. Pendent party jurisdiction and supplementary jurisdiction are asserted over plaintiff's state law claims pursuant to the New York State Human Rights Law, (NYS Executive Law-Article 15), and the New York City Human Rights Law, Administrative Code 8-102 et seq.

6. The amount in controversy exceeds $150,000.

7. Venue is laid within the United States District Court for the Southern District of New York in that one or more of the defendants, including the defendant City of New York, reside in said district and a substantial part of the events or omissions occurred in the Southern District. 28 U.S.C. 1391 (b) (1) & (2).

## PARTIES

8. Plaintiff is a citizen of the United States and at all relevant times has resided in the County of Queens, State of New York.

9. At all times relevant hereto, the defendant City of New York was and is a municipal corporation organized and existing under the laws of the State of New York.

10. At all times hereinafter mentioned, the Defendant New York City Police

3

Department (NYPD) was a department and/or agency of the defendant City of New York.

11.  Defendant Former New York City Police Commissioner Raymond Kelly ("the Former Police Commissioner") was, at all relevant times herein, the Commissioner of the NYPD and, as such, was a policy maker with respect to the condition and staffing of Police Precinct jails and holding pen facilities and the supplying of assistive devices for the disabled to such facilities and the training, supervision, and discipline of NYPD Police Officers, including defendants NYPD Police Officer Joseph Bonner (Shield # 24680,Tax Reg. No. 915329), NYPD Police Officer Manuel Almanzar, (Shield # 8189, Tax Reg. No. 937968), NYPD Police Officer "John" Chen (Shield No. 11880), NYPD Police Officer "John" Cascone (Shield # 12233) and Police Officers JOHN DOE # 1 through 5.  The Former Commissioner is sued in his individual and official capacities.

12.  Defendant New York City Police Commissioner William J. Bratton ("the Police Commissioner") was and is, at certain relevant times herein, the Commissioner of the NYPD and, as such, was and is a policy maker with respect to the condition and staffing of Police Precinct jails and holding pen facilities and the supplying of assistive devices for the disabled to such facilities and the training, supervision, and discipline of NYPD Police Officers. The Commissioner is sued in his individual and official capacities.

13.  Defendant NYPD Police Officer Joseph Bonner (Shield # 24680,Tax Reg. No. 915329) was at all times herein mentioned and still is a police officer employed by the New York City Police Department and was the arresting officer with respect to the arrest of plaintiff at the time and place hereinafter alleged.  Officer Bonner is sued in his individual and official capacities.

4

14. Defendant NYPD Police Officer Manuel Almanzar, (Shield # 8189, Tax Reg. No. 937968) was at all times herein mentioned and still is a police officer employed by the New York City Police Department and was the officer charged with administering a chemical breath test to plaintiff at the time and place hereinafter alleged. Officer Almanzar is sued in his individual and official capacities.

15. Defendant NYPD Police Officer "John" Chen, (Shield # 11880) was at all times herein mentioned and still is a police officer employed by the New York City Police Department and was the officer charged with witnessing and videotaping the administration, or attempted administration of a chemical breath test to plaintiff at the time and place hereinafter alleged. Officer Chen is sued in his individual and official capacities.

16. Defendant NYPD Police Officer "John Cascone, (Shield # 12233) the first name being fictitious and unknown to plaintiff, was at all times herein mentioned and still is a police officer employed by the New York City Police Department and was the officer who purported to serve as a qualified sign language interpreter for plaintiff at the time and place hereinafter alleged. Officer Cascone is sued in his individual and official capacities.

17. Defendants New York City Police Officers "John Doe # 1 - 5", are members of the New York City Police Department who, upon information and belief were, at the times herein mentioned, were involved in the arrest, transportation and/or confinement of plaintiff and are sued in their individual and official capacities.

18. At all times hereinafter mentioned, the Defendant New York City Department of Corrections (NYDOC) was a department and/or agency of the defendant City of New York.

19. Defendant Former New York City Corrections Commissioner Dora B.

Schriro was, at all relevant times herein, the Commissioner of the NYCDOC and, as such, was a policy maker with respect to the condition, and staffing of jail and holding pen facilities and the supplying of assistive devices for the disabled to such facilities and the training, supervision, and discipline of New York City Corrections Officers including defendants New York City Corrections Officers "John Doe # 6 - 15. The Former Commissioner is sued in her individual and official capacities.

20. New York City Corrections Commissioner JOSEPH PONTE was and is, at certain relevant times herein, the Commissioner of the NYCDOC and, as such, was a policy maker with respect to the condition, and staffing of jail and holding pen facilities and the supplying of assistive devices for the disabled to such facilities and the training, supervision, and discipline of New York City Corrections Officers. The Commissioner is sued in his individual and official capacities.

21. New York City Corrections Officers "John Doe # 6 - 15, are Corrections Officers employed by the New York City Department of Corrections who, upon information and belief were, at the times herein mentioned, assigned to the jail facilities and holding pens located at Manhattan Central Booking and the holding pens located at New York County Criminal Court, and are sued in their individual and official capacities.

22. At all times hereinafter mentioned, defendant Bellevue Hospital Center (Bellevue) was a hospital owned and operated by the defendant City of New York and was a member hospital of the New York City Health and Hospitals Corporation.

23. At all times hereinafter mentioned the defendant New York City Health and Hospitals Corporation (HHC) was a municipal corporation organized and existing under the laws

of the State of New York which owned and operated municipal hospitals including Bellevue Hospital Center.

24.  At all times herein mentioned, the defendant The State of New York was a state government established and existing under the Constitutions and laws of the United States and New York State.

25.  At all times herein mentioned the defendant New York State Office of Court Administration (OCA) was an Office/Department/Bureau/Division of the defendant State of New York established and charged with the ownership, operation, maintenance, control and policy making of all of the Courts in the State of New York and its Unified Court System, including the New York County Criminal Court.

26.  At all times herein mentioned, the defendants, their agents, servants and employees were acting under color of state law, to wit: under color of the statutes, ordinances, rules, regulations, policies, customs and usages of the City and State of New York.

27.  During all times relevant and material to this case, the actions of the individual Police Officers complained of herein were done as part of the custom, practice, usage, rules, regulations, and/or directives of defendants City of New York and its New York City Police Department, and the defendant City of New York is, as such, responsible for the said defendants' individual actions.  Defendant City of New York is further responsible for the actions of the individual defendants under the principal/agent and respondeat superior rules.

28.  During all times relevant and material to this case, the actions of the individual Corrections Officers complained of herein were done as part of the custom, practice, usage, rules, regulations, and/or directives of defendants City of New York and its New York

7

City Department of Corrections, and the defendant City of New York is, as such, responsible for

the said defendants' individual actions. Defendant City of New York is further responsible for

the actions of the individual defendants under the principal/agent and respondeat superior rules.

### FACTUAL ALLEGATIONS

29.  Plaintiff Susan Jones is a deaf, speech impaired individual who

communicates through American Sign Language ("ASL"). As such, he is a qualified individual

with a disability as defined by both, the ADA, 42 U.S.C. 12102(2) and the Rehabilitation Act, 29

U.S.C.705(2)(B) and she further qualifies as a person with a disability and/or disabled person

under the New York State Human Rights Law, (Executive Law Sec. 292) and the New York City

Human Rights Law, (Administrative Code Sec.8-102).

30.  The defendant City of New York is a provider of State and Local Government

Services as defined in Title II of the ADA and a Public Accommodation as defined in Title III of

the ADA as well as the New York State Human Rights Law and New York City Human Rights

Law. In addition, the City of New York and its Police Department and Department of

Corrections are recipients of federal funds as defined by the Rehabilitation Act.

31.  The defendant HHC is a provider of State and Local Government Services as

defined in Title II of the ADA and a Public Accommodation as defined in Title III of the ADA as

well as the New York State Human Rights Law and New York City Human Rights Law. In

addition, the HHC is a recipient of federal funds as defined by the Rehabilitation Act.

32.  The defendants The State of New York and its Office of Court

Administration are  providers of State and Local Government Services as defined in Title II of

the ADA and Public Accommodations as defined in Title III of the ADA as well as the New

8

York State Human Rights Law and New York City Human Rights Law. In addition, The State of New York and its Office of Court Administration and the Courts under their control are recipients of federal funds as defined by the Rehabilitation Act.

33. As a resident of the State and City of New York and as an individual who relies upon the services and programs provided by the City of New York and the State of New York as well as the public accommodations and court facilities within the City and State of New York, plaintiff will likely have further interactions with and will continue to utilize the services and facilities of the City of New York, including its New York City Police Department, its New York City Department of Corrections, and its Health and Hospitals Corporation and will also continue to have further interaction with and utilize the services, programs, and facilities of the State of New York, including its Office of Court Administration and the Courts owned, operated and controlled by said Office..

34. On June 2, 2012 at approximately in 1:20 A.M. in and about the vicinity of 99 Madison Avenue, in the borough of Manhattan, City and State of New York, defendant Police Officer Joseph Bonner approached plaintiff Susan Jones who was seated in her parked automobile and undertook to attempt to communicate with her orally.

35. In response to the oral communications from defendant Bonner, which plaintiff could not hear, plaintiff, using hand gestures, informed defendant Bonner that she was deaf and could not hear him.

36. Plaintiff attempted to explain to defendant Bonner that she was not driving and was awaiting the arrival of a friend from the nearby restaurant where she and her friends had been socializing, as that friend would be driving Ms. Jones' vehicle.

37.  Defendant Bonner thereupon directed plaintiff to exit her vehicle and, through gestures, indicated to plaintiff that he believed she had been drinking.

38.  Knowing that he was unable to effectively communicate with plaintiff, Officer Bonner failed to give plaintiff the opportunity to submit to a field sobriety test as is commonly administered to drivers suspected of being intoxicated but who can hear.  As such, Officer Bonner subjected plaintiff to disparate treatment.

39.  As Plaintiff and several deaf individuals who were in the vicinity and observed what was happening continued to inform defendant Bonner that plaintiff was deaf. Defendant Bonner then began communicating with one such individual who had some ability to communicate orally and through such individual, directed plaintiff to submit to a portable breath test (PBT), threatening her that she would be arrested if she refused.

40.  Plaintiff submitted to the PBT at 1:50 AM and was thereupon arrested by Officer Bonner who reported the time of arrest as being 2:13 AM.

41.  In arresting plaintiff, Officer Bonner cuffed her hands behind her back, thereby depriving plaintiff of her only means of communication, ASL, which form of communication is completely dependent upon the deaf person's use of his/her hands.

42.  Plaintiff was initially transported to by defendant Bonner to the 14th Precinct and confined to a cage.  Plaintiff's numerous requests for a sign language interpreter during confinement at the 14th Precinct were ignored.  Defendants did however allow plaintiff a short visit with her step-daughter who informed them that plaintiff was requesting that they contact her attorney who was capable of communicating in sign language and that plaintiff needed an interpreter during her confinement.

10

43. During plaintiff's period of confinement at the 14th Precinct defendants did not contact plaintiff's attorney nor did they provide plaintiff with the reasonable accommodations of a Telecommunication Device for the Deaf (TDD) with which to contact her attorney or anyone else, and they did not provide plaintiff with the reasonable accommodation of a sign language interpreter.

44. Thereafter, plaintiff, without being informed where she was being taken and why, was again cuffed with her hands behind her back, again depriving plaintiff of her sole means of communication and plaintiff was thereafter transported from the 14th Precinct to the 7th Precinct.

45. Upon arrival at the 7th precinct, plaintiff was again confined in a cage and her repeated requests for an ASL interpreter and TDD were ignored.

46. While confined to the cage at the 7th precinct, plaintiff repeatedly gestured to police officers in the vicinity to give her access to a TDD and to provide her with an interpreter. In response, police officers, whose identities are currently unknown ro plaintiff, mocked plaintiff, making gestures that she was drinking and drunk, and ignored her request for the said accommodations.

47. NYPD records indicate that plaintiff was first "offered" a chemical breath test at the 7th precinct at 4:38 AM. Plaintiff repeatedly informed the officers involved, including defendants Bonner, Almanzar, and Chen that she required the assistance of an ASL interpreter to understand what was being said to her and asked of her in order to take the test. As a result, the test was not administered.

48. Thereafter, despite knowing that the first attempt to administer a chemical

breath test had been aborted due to plaintiff's insistence upon an ASL interpreter and defendants'
failure to supply such accommodation, the police officer defendants again attempted to induce
plaintiff to submit to a chemical breath test without an ASL interpreter at approximately 6:12
AM. Plaintiff persisted in her request for an ASL interpreter.

49. At approximately 6:20 AM, defendant Officer Cascone entered into the
testing room and purported to proceed to provide sign language interpreting services to plaintiff.

50. Plaintiff immediately notified Officer Cascone that he was not a proper or
qualified interpreter and that she wanted a certified sign language interpreter.

51. When defendant Officer Cascone informed defendants Bonner and Almanzar
that plaintiff was objecting to his serving as an interpreter, defendant Cascone was told to tell
plaintiff that they were treating her objection as a refusal to take the test.

52. Defendants Bonner and Almanzar thereupon continued their attempt to
administer the test with defendant Almanzar orally reading from an "Intoxicated Driver
Examination Instruction Sheet" information which said sheet instructs as follows: "The
following instructions will be read slowly and clearly to the subject. The subject will be facing
the video camera when he/she gives his/her answer."

53. While such reading from the "Intoxicated Driver Examination Instruction
Sheet was occurring, defendant Cascone stood still without communicating in sign what was
being said, even as plaintiff repeatedly asked Cascone what was being said.

54. In response to plaintiff's objecting that defendant Cascone was not signing
what was being said, defendant Almanzar told defendant Cascone to "Tell her to read question
A," thereby demanding that plaintiff herself read a statement and question that the instructions

12

expressly state are to be read to the test subject "slowly and clearly"

55. When plaintiff continued to object to defendant Cascone's failure to convey what was being said and to his serving as an interpreter, one of the defendant Officers stated "Put it down as a refusal."

56. Thereupon, at approximately 6:23 AM, Officer Almanzar falsely completed documents reporting that plaintiff had refused to submit to a chemical breath test.

57. While falsely reporting and recording that defendant had refused to submit to a chemical breath test, defendant Bonner completed Sheet 2 of an Arresting Officer's Intoxicated Driver Examination form by leaving blank all information required by said form to be obtained from the defendant and writing across said sheet "LANGUAGE BARRIER" thereby acknowledging the barrier that existed in his ability to communicate with plaintiff in the absence of a sign language interpreter.

58. As a result of the report made by the defendant police officers to the effect that plaintiff had refused to submit to a chemical breath test, plaintiff was subjected to immediate confiscation and suspension of her driver's license at arraignment and was mandated to submit to a Motor Vehicle Department Refusal Hearing.

59. In addition, as a result of the reported "refusal," and in accordance with the policy of the New York County District Attorney's Office plaintiff was initially rendered ineligible for a reduction of the charges from the misdemeanor criminal charge of Driving While Intoxicated (DWI) to the non-criminal violation charge of Driving While Ability Impaired (DWAI), which is offered to first time DWI defendants such as plaintiff in the absence of a refusal.

60. Thereafter, the defendant police officers failed and refused to appear for the DMV Refusal Hearing, resulting in the eventual dismissal of the "refusal" allegations against plaintiff.

61. Notwithstanding its policy of not offering reduced DWAI pleas to DWI defendants who have refused a chemical breath test, the District Attorney's Office, upon viewing the video of what transpired in connection with the attempted administration of the chemical breath test to plaintiff, eventually agreed to offer the DWAI plea to plaintiff.

62. Following the failed attempted administration of the chemical breath test to plaintiff, plaintiff was thereupon again cuffed with her hands behind her back, once again depriving her of her sole means of communication, and was transported to confinement at the New York County Criminal Court holding facility where she was in the custody, supervision and control of the New York City Department of Corrections and its Corrections Officers.

63. During the entire time that plaintiff was in the custody of NYPD and its police officers, plaintiff was not given the same access to telephone communications and other means of communication as was provided to other detainees in the custody of NYPD and plaintiff had no access to counsel.

64. At the time of her arrest and while plaintiff was in the custody and control of the NYPD and its officers, there was in effect a 3 year Consent Decree which had been entered into between the United States of America and the New York City Police Department wherein, in exchange for the USA's agreement to refrain from filing suit against the NYPD for violations of the ADA, they NYPD agreed to effectuate policies and procedures specified in the consent decree in order to assure effective communication between employees and officers of the NYPD

14

and individuals with hearing impairments.

   65. Among other things the aforesaid consent decree contained the following

provisions:

> 5. In order to ensure the continued effective communication
> with qualified individuals with hearing impairments in the
> NYPD's programs, activities and services, the NYPD will:
>
> a. Continue to ensure that its services, programs and
> activities are accessible to qualified individuals with
> hearing impairments, as required by 28 C.F.R. § 35.161,
> through the use of appropriate auxiliary aids and services,
> including, but not limited to, the City of New York's
> "311'1 non-emergency system (TTY No. 212-504-4115),
> via the nationwide Telecommunications Relay Service
> "711", or qualified sign language interpreters. In a
> situation where the NYPD would allow a person access to
> a telephone, the NYPD shall provide qualified individuals
> with hearing impairments the opportunity to place calls
> through the use of appropriate auxiliary aids and services,
> including, but not limited to, qualified sign language
> interpreters.
>
> b. Continue to provide, at no cost to the qualified individual
> with a hearing impairment, appropriate auxiliary aids and
> services, including, but not limited to, qualified interpreters,
> when necessary to provide effective communication to
> qualified individuals with hearing impairments. . . . In
> determining whether a qualified interpreter is required,
> consideration should be given to the nature and importance
> of the communication at issue, the complexity or length of
> the communication, and such other factors as are appropriate
> within the discretion of the NYPD. The NYPD shall continue
> to maintain a list of "on-call" qualified sign language interpreters
> who are available 24 hours a day. The NYPD shall provide a
> qualified sign language interpreter within a reasonable time
> after the request is made. Sign language services, whether
> through use of the NYPD's "on-call" list or though the New
> York Citywide Contract, shall be available 24 hours a day.
>
> c. Give primary consideration to the requests of qualified

individuals with hearing impairments in determining what
type of auxiliary aid or service is necessary. "Primary
consideration" means that the NYPD will defer to the
individual's request, consistent with the NYPD's duties
pursuant to 28 C.F.R. § 35.164.

d. The NYPD will provide notice of the availability of
auxiliary aids and services for qualified individuals with
hearing impairments through the distribution of pamphlets,
posters or other appropriate means, including, but not
limited to "The Americans with Disabilities Act What
You Should Know" . . .

66.  Said consent decree also contained the following provisions defining

Auxiliary Aids and Services, Qualified Interpreters and Effective Communication:

A. "Auxiliary aids and services" will mean qualified
interpreters, note takers, transcription services, written
materials, telephone handset amplifiers, assistive listening
devices, telephones compatible with hearing aids, closed
caption decoders, open and closed captioning,
Telecommunications Devices for the Deaf (TDDs),
videotext displays, or other effective methods of making
aurally delivered materials available to individuals with
hearing impairments.

C. "Qualified interpreter" will mean and refer to a sign
language or oral interpreter who is able to interpret
effectively, accurately, and impartially, both receptively
and expressively, using any necessary specialized
vocabulary. Accordingly, an interpreter must be able to
sign to the deaf individual (or interpret orally to the person
who does not use sign language) what is being said by the
hearing person and to voice to the hearing person what is
being signed or said by the deaf individual. The interpreter
must be able to interpret in the language the deaf person
uses (e.g., American Sign Language or Signed English)
and must be familiar with terms and phrases commonly
used during booking and detention. Additionally,
although a qualified interpreter may be certified, a
certified interpreter is not necessarily qualified, if he
or she is not a good communications match for the

16

deaf person (e.g., where the deaf person uses Signed
English and the interpreter uses American Sign
Language) or the situation (e.g., where the interpreter
is unfamiliar with the necessary specialized vocabulary).

D. "Effective communication" will mean communication
with persons with disabilities that is as effective as
communication with others. Effective communication is
achieved by furnishing appropriate auxiliary aids and
services where necessary to afford qualified individuals
with a disability an equal opportunity to participate in or
benefit from the services, programs, or activities of a public
entity.

67.  Plaintiff remained in the custody of the DOC and its corrections officers from

the time she was transported to their facility until the time she was ultimately arraigned and

released.

68.  During the time that plaintiff was in the custody of DOC and its corrections

officers, plaintiff requested that she be provided with a sign language interpreter and a TDD and

such request were ignored and not complied with.  As such, plaintiff was unable to communicate

with her attorney and others.

69.  During the entire time that plaintiff was in the custody of NYPD and DOC

and its corrections officers, plaintiff was not given the same access to telephone communications

and other means of communication as was provided to other detainees in the custody of NYPD

and DOC and plaintiff had no access to counsel and corrections officers and other inmates due to

the failure of NYPD and DOC to provide her with a reasonable accommodations, including a

sign language interpreter. In addition, plaintiff  was deprived of her right to make telephone

communications with family, friends and/or attorneys due to the fact that the City and its Police

Department and Police Officers and Corrections Department and Corrections Officers failed to

17

provide plaintiff with a Teletypewriter Device for the Deaf (TDD), which device was readily available in all police precincts and for purchase throughout the City, State, and Country, and which device would have enabled plaintiff to exercise the same rights of communication as are available to and afforded to non-hearing impaired individuals detained in Police Custody and/or Correctional facilities. During this period of detention, plaintiff expressly requested Police Officers and Corrections Officers at the said Precincts and jails and holding pens to provide her with a sign language interpreter and TDD and they failed and refused to do so.

70. Due to defendants' failure to provide effective communication with plaintiff, defendants misunderstood plaintiff when, in response to an inquiry, she attempted to inform them that she had high cholesterol. Defendants instead concluded that she was complaining of high blood pressure and caused her to be transported to Bellevue Hospital Center for treatment of what they thought was a high blood pressure condition. As a result, plaintiff's time in confinement was extended as her court appearances were delayed due to her hospitalization.

71. Plaintiff's time in confinement was further extended due to the failure of Police and Corrections Officers to timely notify the Courts that a sign language interpreter would be needed to assist plaintiff in Court.

72. Plaintiff's appearances before a Judge in Manhattan Criminal Court was delayed, while other accused individuals brought to the facilities after plaintiff's arrival were given earlier appearances before a Judge, all due to the fact that the New York City Criminal Court, under the control and supervision of OCA, was not prepared and staffed so as to assure that an ASL interpreter is available for arraignment of hearing impaired individuals when they are otherwise processed and ready for arraignment. As such, while others being held for

18

arraignment were brought to Court, arraigned and released in timely fashion, plaintiff, who had been arrested in the early morning hours of June 2 was confined and imprisoned until late in the afternoon of Sunday, June 3, 2012. Plaintiff was thus subjected to disparate treatment in connection with the timing of her court appearance.

73.  As hereinbefore alleged, while being held in custody, plaintiff was transported by NYPD and/or DOC officers to Bellevue Hospital Center for treatment. While so hospitalized, plaintiff was subjected to questioning and treatment by hospital staff and physicians without being provided with a Sign Language Interpreter as required by the NYS Department of Health's Patient's Bill of Rights.

74.  Plaintiff was thus deprived of the ability to effectively communicate with her health care providers and was deprived of an equal opportunity to participate in or benefit from the services, programs, or activities of the hospital.

75.  Plaintiff was subjected to discrimination on the basis of his disabilities, to wit deafness and an inability to speak orally, in violation of her rights under Federal, State and City Law, resulting in severe emotional distress to her. In addition, as a result of her the deprivation of the reasonable accommodations she needed to communicate with others, including counsel of her choosing, during her confinement, plaintiff  was subjected to discrimination on the basis of disability, was deprived of equal opportunity to participate in or benefit from the services, programs, or activities of the defendants' programs and activities, and was thereby further caused to experience extreme anxiety, fear, humiliation, depression, loss of self-esteem and paranoia, all of which commenced and continued during and subsequent to her confinement and all of which continues to this day and is expected to continue into the foreseeable future and

which will scar plaintiff for the remainder of her life.

## AS AND FOR A FIRST CAUSE OF ACTION
## VIOLATION OF THE REHABILITATION ACT
### (NYC, NYPD, & ALL POLICE OFFICERS)
### (COMPENSATORY & PUNITIVE DAMAGES)

76. Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

77. At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 was in full force and effect and applied to the Defendants' conduct.

78. At all times relevant to this action, the regulations implementing Section 504 of the Rehabilitation Act, 28 CFR 45.501 et seq. and 28 CFR 42.106 - 42.110 were in full force and effect and applied to the Defendant's conduct.

79. At all times relevant to this action, Plaintiff was and is a "handicapped person" within the meaning of the Rehabilitation Act including its regulations at 28 C.F.R. Part 45.

80. At all times relevant to this action, Plaintiff was and is an "otherwise qualified individual" within the meaning of the Rehabilitation Act and the regulations promulgated thereunder.

81. At all times relevant to this action, Defendants City of New York and its Police Department were recipients of federal funds within the meaning of the Rehabilitation Act.

82. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides: "No

20

otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance".

83.   Under the federal regulations promulgated pursuant to the Rehabilitation Act, a recipient of federal assistance must provide effective communication by means of auxiliary aids and services including qualified sign language interpreters and TDDs, to deaf individuals.

84.   Defendants' failure and refusal to ensure effective communication with and for Plaintiff as hereinbefore alleged constituted discrimination against Plaintiff on the basis of her disability in violation of Section 504 of the Rehabilitation Act.

85.   Defendants' failure to provide effective communication with and for Plaintiff as hereinbefore alleged in violation of their obligations under the Rehabilitation Act has directly injured, and continues to injure, Plaintiff.

86.   Defendants' violations of the Rehabilitation Act mentioned above deprived plaintiff of the accommodations to which she was entitled and were intentional and the product of defendants' deliberate indifference to the strong likelihood that their policies and conduct would likely result in a violation of federally protected rights.

87.   The intentional nature of the violations of the Rehabilitation act on the part of the defendant City, its NYPD, and the defendant police officers, and their deliberate indifference is demonstrated by the fact that their conduct, as hereinbefore alleged, constituted a direct violation of the provisions of the aforesaid Consent Decree which had been entered into between the United States and the NYPD, a Consent Decree that had been in effect since November, 2009, some 2 ½ years prior to plaintiff's arrest and confinement.

21

88.  Defendants violated the Rehabilitation Act, its regulations and the provisions of the Consent Decree in failing to ensure that their services, programs and activities were accessible to qualified individuals with hearing impairments and plaintiff in particular through the use of appropriate auxiliary aids and services, including, but not limited to, the provision of qualified sign language interpreters and TDD's; in failing to provide qualified individuals with hearing impairments and plaintiff in particular, with the opportunity to place calls through the use of appropriate auxiliary aids and services, including, but not limited to, qualified sign language interpreters and TDDs in a situation where the NYPD would allow a person access to a telephone; in failing to provide qualified individuals with a hearing impairment, and plaintiff in particular, with appropriate auxiliary aids and services, including, but not limited to, qualified interpreters, when necessary to provide effective communication; in failing to maintain a list of "on-call" qualified sign language interpreters who are available 24 hours a day; in failing to provide plaintiff with a qualified sign language interpreter within a reasonable time after the request was made; in failing to assure that sign language services would be available 24 hours a day; in failing to give primary consideration to the requests of qualified individuals with hearing impairments, and plaintiff in particular, in determining what type of auxiliary aid or service is necessary; in failing to provide plaintiff with notice of the availability of auxiliary aids and services for qualified individuals with hearing impairments through the distribution of pamphlets, posters or other appropriate means, including, but not limited to copies of the publication "The Americans with Disabilities Act What You Should Know;" in failing to provide plaintiff with a sign language interpreter who was able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, in

failing to provide plaintiff with an interpreter able to sign to the deaf individual, and plaintiff in particular (or interpret orally to the person what was being said by the hearing person and to voice to the hearing person what was being signed or said by the deaf individual, and plaintiff in particular. In failing to provide plaintiff with an interpreter able to interpret in the language the plaintiff uses; and in providing plaintiff with an interpreter who was not a good communications match for the plaintiff; and in failing to provide plaintiff with communication that was as effective as communication with others who are not deaf or hearing impaired.

89. Such intent and deliberate indifference is also evidenced by the fact that the Rehabilitation Act has been in effect since 1973, almost 40 years prior to plaintiff's arrest and confinement and defendants have failed to bring themselves into compliance with the requirements of said statute and its applicable regulations despite that extraordinary passage of time.

90. Defendants violations of the Rehabilitation Act and its applicable regulations as hereinbefore alleged subjected plaintiff to discrimination on the basis of her disability and deprived plaintiff of her right to an equal opportunity to participate in or benefit from the services, programs, or activities of a the defendant public entities and directly caused Plaintiff to sustain past and continuing physical and emotional injuries. Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury as a result of Defendants' patterns and practices of discrimination.

91. Plaintiff has thereby been damaged by the violation of the Rehabilitation Act on the part of the defendants City of New York, NYPD and the defendant police officers and demands compensatory damages in the sum of Five Million Dollars and punitive damages in the

sum of One Million Dollars and together with attorneys' fees and the costs and disbursements of this action.

## AS AND FOR A SECOND CAUSE OF ACTION
### VIOLATION OF THE REHABILITATION ACT
#### (NYC, DOC, & ALL CORRECTIONS OFFICERS)
#### (COMPENSATORY & PUNITIVE DAMAGES)

92. Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

93. At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 was in full force and effect and applied to the Defendants' conduct.

94. At all times relevant to this action, the regulations implementing Section 504 of the Rehabilitation Act, 28 CFR 45.501 et seq. and 28 CFR 42.106 - 42.110 were in full force and effect and applied to the Defendant's conduct.

95. At all times relevant to this action, Plaintiff was and is a "handicapped person" within the meaning of the Rehabilitation Act including its regulations at 28 C.F.R. Part 45.

96. At all times relevant to this action, Plaintiff was and is an "otherwise qualified individual" within the meaning of the Rehabilitation Act and the regulations promulgated thereunder.

97. At all times relevant to this action, Defendants City of New York, and its Corrections Department were recipients of federal funds within the meaning of the Rehabilitation Act.

98. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance".

99. Under the federal regulations promulgated pursuant to the Rehabilitation Act, a recipient of federal assistance must provide effective communication by means of auxiliary aids and services including qualified sign language interpreters and TDDs, to deaf individuals.

100. Defendants' failure and refusal to ensure effective communication with and for Plaintiff as hereinbefore alleged constituted discrimination against Plaintiff on the basis of her disability in violation of Section 504 of the Rehabilitation Act.

101. Defendants' failure to provide effective communication with and for Plaintiff as hereinbefore alleged in violation of their obligations under the Rehabilitation Act has directly injured, and continues to injure, Plaintiff.

102. Defendants' violations of the Rehabilitation Act mentioned above deprived plaintiff of the accommodations to which she was entitled and were intentional and the product of defendants' deliberate indifference to the strong likelihood that their policies and conduct would likely result in a violation of federally protected rights.

103. The intentional nature of the violations of the Rehabilitation act on the part of the defendant City, its DOC and its corrections officers, and their deliberate indifference is demonstrated by the fact that their conduct, as hereinbefore alleged, constituted a direct violation of the provisions of the Rehabilitation Act and its regulations, which statute and regulations had been in effect since 1973, almost 40 years prior to plaintiff's arrest and confinement and defendants have failed to bring themselves into compliance with the requirements of said statute

25

and its applicable regulations despite that extraordinary passage of time.

104.   Defendants violated the Rehabilitation Act, and its regulations in failing to ensure that their services, programs and activities were accessible to qualified individuals with hearing impairments and plaintiff in particular through the use of appropriate auxiliary aids and services, including, but not limited to, the provision of qualified sign language interpreters and TDDs; in failing to provide qualified individuals with hearing impairments and plaintiff in particular, with the opportunity to place calls through the use of appropriate auxiliary aids and services, including, but not limited to, qualified sign language interpreters and TDDs in a situation where the NYPD would allow a person access to a telephone; in failing to provide qualified individuals with a hearing impairment, and plaintiff in particular, with appropriate auxiliary aids and services, including, but not limited to, qualified interpreters, when necessary to provide effective communication; in failing to maintain a list of "on-call" qualified sign language interpreters who are available 24 hours a day; in failing to provide plaintiff with a qualified sign language interpreter within a reasonable time after the request was made; in failing to assure that sign language services would be available 24 hours a day; in failing to give primary consideration to the requests of qualified individuals with hearing impairments, and plaintiff in particular, in determining what type of auxiliary aid or service is necessary; in failing to provide plaintiff with notice of the availability of auxiliary aids and services for qualified individuals with hearing impairments through the distribution of pamphlets, posters or other appropriate means, including, but not limited to copies of the publication "The Americans with Disabilities Act What You Should Know;" in failing to provide plaintiff with a sign language interpreter who was able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, in failing to provide plaintiff with an interpreter able to sign to

26

the deaf individual, and plaintiff in particular (or interpret orally to the person what was being said by the hearing person and to voice to the hearing person what was being signed or said by the deaf individual, and plaintiff in particular. In failing to provide plaintiff with an interpreter able to interpret in the language the plaintiff uses; and in providing plaintiff with an interpreter who was not a good communications match for the plaintiff; and in failing to provide plaintiff with communication that was as effective as communication with others who are not deaf or hearing impaired.

105.  Defendants violations of the Rehabilitation Act and its applicable regulations as hereinbefore alleged subjected plaintiff to discrimination on the basis of her disability and deprived plaintiff of her right to an equal opportunity to participate in or benefit from the services, programs, or activities of a the defendant public entities and directly caused Plaintiff to sustain past and continuing physical and emotional injuries. Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury as a result of Defendants' patterns and practices of discrimination.

106.  Plaintiff has thereby been damaged by the violation of the Rehabilitation Act on the part of the defendants City of New York, its DOC and its corrections officers and demands compensatory damages in the sum of Five Million Dollars and punitive damages in the sum of One Million Dollars and together with attorneys' fees and the costs and disbursements of this action.

AS AND FOR A THIRD CAUSE OF ACTION

VIOLATION OF THE REHABILITATION ACT

(THE STATE OF NEW YORK & OCA)

(COMPENSATORY & PUNITIVE DAMAGES)

27

107.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

108.  At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 was in full force and effect and applied to the Defendants' conduct.

109.  At all times relevant to this action, the regulations implementing Section 504 of the Rehabilitation Act, 28 CFR 45.501 et seq. and 28 CFR 42.106 - 42.110 were in full force and effect and applied to the Defendant's conduct.

110.  At all times relevant to this action, Plaintiff was and is a "handicapped person" within the meaning of the Rehabilitation Act including its regulations at 28 C.F.R. Part 45.

111.  At all times relevant to this action, Plaintiff was and is an "otherwise qualified individual" within the meaning of the Rehabilitation Act and the regulations promulgated thereunder.

112.  At all times relevant to this action, Defendants The State of New York and the New York State Office of Court Administration were recipients of federal funds within the meaning of the Rehabilitation Act.

113.  Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance".

114.  Under the federal regulations promulgated pursuant to the Rehabilitation Act, a recipient of federal assistance must provide effective communication by means of

28

auxiliary aids and services including qualified sign language interpreters and TDDs, to deaf individuals.

115.    Defendants' failure and refusal to ensure effective communication with and for Plaintiff as hereinbefore alleged constituted discrimination against Plaintiff on the basis of her disability in violation of Section 504 of the Rehabilitation Act.

116.    Defendants' failure to provide effective communication with and for Plaintiff as hereinbefore alleged in violation of their obligations under the Rehabilitation Act has directly injured, and continues to injure, Plaintiff.

117.    Defendants' violations of the Rehabilitation Act mentioned above deprived plaintiff of the accommodations to which she was entitled and were intentional and the product of defendants' deliberate indifference to the strong likelihood that their policies and conduct would likely result in a violation of federally protected rights.

118.    The intentional nature of the violations of the Rehabilitation act on the part of the defendant State and its OCA, and their deliberate indifference is demonstrated by the fact that their conduct, as hereinbefore alleged, constituted a direct violation of the provisions of the Rehabilitation Act and its regulations, which statute and regulations had been in effect since 1973, almost 40 years prior to plaintiff's appearance before the New York City Criminal Court on June 3, 2012 and defendants have failed to bring themselves into compliance with the requirements of said statute and its applicable regulations despite that extraordinary passage of time.

119.    Defendants violated the Rehabilitation Act, and its regulations in failing to ensure that their services, programs and activities were accessible to qualified individuals with hearing impairments and plaintiff in particular through the use of appropriate auxiliary aids and